## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| *UNITED STATES OF AMERICA* | ) | |
| | ) | |
| *v.* | ) | *Criminal No. 08-54-P-S* |
| | ) | |
| *RICHARD W. SZPYT, et al.,* | ) | |
| | ) | |
| *Defendants* | ) | |

## RECOMMENDED DECISION ON MOTIONS TO SUPPRESS

Co-defendants James E. Weston, Cynthia A. Moore, Sherwood K. Jordan, Robert L. Sanborn, Lara M. Sanborn, Walter D. Towle, Jr., and Daniel A. Guarino, indicted on charges, *inter alia*, of conspiring to distribute, and possess with intent to distribute, controlled substances, including five kilograms or more of cocaine, and marijuana, and aiding and abetting such conduct, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and 18 U.S.C. § 2, *see* Superseding Indictment (Docket No. 456), move to suppress the contents of intercepted telephone communications on the basis that the necessity for the wiretaps through which those communications were intercepted was not adequately established, *see* Motion To Suppress Wire Intercepts ("Weston Motion") (Docket No. 346); Motion To Suppress Evidence of Intercepted Telephone Conversations ("Moore Motion") (Docket No. 352); Defendant Sherwood Jordan's Motion To Suppress Wiretap Intercepts ("Jordan Motion") (Docket No. 357); Motion To Suppress Evidence of Intercepted Telephone Conversations ("Guarino Motion") (Docket No. 368); Motion To Suppress Wire Intercepts and Motion To Incorporate the Motion and Memorandum of Co-Defendant James E. Weston ("Sanborn Motion") (Docket Nos. 375 and 376); Motion To Suppress Wire Intercepts and Motion To Incorporate the Motion and

1

Me[m]orandum of Co-Defendant James E. Weston ("Lara Sanborn Motion") (Docket No. 377); Motion To Suppress "Wiretap" Intercepts and To Incorporate the Motion and Memorandum of Co-Defendant James E. Weston ("Towle Motion") (Docket No. 378).

Moore and Guarino also filed separate motions to join in and adopt Weston's motion to suppress, *see* Motion To Join in and Adopt the Motion To Suppress of Co-Defendant James E. Weston ("Moore Joinder Motion") (Docket No. 354); Motion To Join in and Adopt the Motion To Suppress . . . of Co-Defendant James E. Weston ("Guarino Joinder Motion") (Docket No. 369), which the court granted, *see* Docket No. 373.  In addition, co-defendants Richard W. Szpyt, Kelley Monahan, Michael A. Martin, and Andre T. Charron filed motions to join in Weston's motion to suppress.  *See* Defendant Szpyt's Motion To Join[] Co-Defendant Weston's Motion To Suppress Wire Intercepts ("Szpyt Joinder Motion") (Docket No. 360); Defendant Kelley Monahan's Joinder in Motions ("Monahan Joinder Motion") (Docket No. 374); Defendant Michael A. Martin's Motion for Leave To Join in and Adopt . . . Motions Filed on Behalf of Co[-]Defendant James Weston[] ("Martin Joinder Motion") (Docket No. 381); Motion To Join Defendant Weston's Motions ("Charron Joinder Motion") (Docket No. 388).  The court granted Szpyt's motion to join, *see* Docket No. 373, and I now grant those of Monahan, Martin, and Charron, as well as those embedded within the separate motions to suppress of Sanborn, Lara Sanborn, and Towle.

Two co-defendants, Moore and Guarino, also seek to suppress intercepted telephone communications on the additional ground that the government failed to adopt reasonable measures to minimize the interception of conversations unrelated to criminal activity.  *See* Moore Motion at 1-2;  Guarino Motion at 1-2.[1]

---

[1] All of the above-referenced motions to suppress and motions to join were filed prior to issuance of the Superseding Indictment on October 22, 2008.  *See generally* Docket.  By order dated October 31, 2008, Chief Judge Singal noted

Weston seeks a hearing on the subject matter of his motion to suppress. *See* Weston Motion at 11. The government contests the need for any such hearing, *see* Government's Memorandum of Law in Opposition to Defendants Weston, Szpyt, Robert Sanborn, Lara Sanborn, Martin, Monahan, Moore, Jordan, Guarino, and Green Motions To Suppress Wire Intercepts ("Opposition") (Docket No. 412) at 18-19, and rightly so. In a case such as this, in which no issue has been raised that the affidavits submitted to the court in support of the relevant wiretap applications contained material falsehoods or omissions, the question presented is whether, upon examination on the face of the affidavits, "the facts set forth in the application were minimally adequate to support the determination that was made[.]" *United States v. Villarman-Oviedo*, 325 F.3d 1, 9 (1st Cir. 2003) (citation and internal quotation marks omitted); *see also, e.g., United States v. Rivera-Rosario*, 300 F.3d 1, 20 (1st Cir. 2002) (in the absence of either "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," or a showing of a material omission in the government's application, defendant was not entitled to an

---

that the court took no action on the defendants' pending motions to suppress, as well as pending motions for bills of particulars, in light of its previous referral of those motions to me, but that I was "free to order any or all of these motions renewed or amended to the extent the Superseding Indictment, including the addition of a new defendant, may have changed the relevant landscape." Order on Defendants' Pending Motions (Docket No. 495) at 4. As Chief Judge Singal recognized, *see id.*, the filing of a superseding indictment does not in itself affect defendants' pending pre-trial motions, *see, e.g., United States v. Bazuaye*, No. 03 CR. 12(KTD), 2004 WL 784835, at *5 (S.D.N.Y. Apr. 12, 2004), *aff'd*, No. 05-5389-CR, 2008 WL 1813244 (2d Cir. 2008) ("The filing of a superseding indictment does not have an effect on the pretrial motions filed on the original indictment unless the district court has ruled that the superseding indictment moots the pending motions.") (citation and internal quotation marks omitted). However, I conclude that, in this case, the filing of the Superseding Indictment did moot two pending motions to suppress: those of Charles Green, who pled guilty prior to issuance of the Superseding Indictment and therefore is not named therein, *see* Defendant Charles Green's Motion [To] Suppress Wire Intercepts Adopting Arguments Made by Defendant Weston in Document No. 346 ("Green Motion") (Docket No. 366); Minute Entry [for Change of Plea Hearing] (Docket No. 444); Superseding Indictment, and Michael Balot, who was separately indicted on the same day as the government filed the Superseding Indictment and hence is not named therein, *see* Motion To Suppress Wire Intercept Evidence ("Balot Motion") (Docket No. 437); Superseding Indictment; Indictment (Docket No. 1), *United States v. Balot*, Criminal No. 08-194-P-S. Last Friday, at his initial appearance in the new case filed against him, Balot, through counsel, raised the issue of his pending motion to suppress. In light of my ruling that the separate indictment against him moots that motion, he is of course free to file a motion to suppress in the new case. The newly-named defendant, Ramon Dellosantos, also remains free to file pretrial motions on such schedule as the court shall allow. Apart from that, I perceive no change in the relevant landscape as it bears on the pending motions to suppress and no need to direct that any of those motions be re-filed.

evidentiary hearing with respect to his challenge to issuance of an order authorizing a wiretap) (citation and internal quotation marks omitted).

Moore and Guarino do not explicitly seek a hearing with respect to the issue of minimization. *See* Moore Motion; Guarino Motion. However, in an abundance of caution, I have considered whether any hearing is warranted as to that issue. I conclude that it is not. The government represents, and Moore and Guarino have not contested, that it has "produced all of the intercepted calls to each of the Defendants." Opposition at 16. Despite having the benefit of that discovery, Moore and Guarino have identified no calls or patterns of calls allegedly revealing inadequate minimization. *See* Moore Motion; Guarino Motion. In the absence of such a showing, no hearing is warranted. *See, e.g., United States v. Giacalone*, 853 F.2d 470, 483 (6th Cir. 1988) ("[D]efendants' reliance on the burden of proof to support their argument [that they are entitled to a hearing on their minimization challenge] is misplaced here. Who bears the burden of production and persuasion at the evidentiary hearing is irrelevant to the separate issue of whether an evidentiary hearing should be held in the first place. And, as the district court ruled, a defendant must make at least some initial showing of contested facts to be entitled to such a hearing."); *United States v. Angiulo*, 847 F.2d 956, 980 n.32 (1st Cir. 1988), *recognized as abrogated on other grounds by United States v. Marino*, 277 F.3d 11 (1st Cir. 2002) ("The defendants assert that at the very least the district court should have granted their motion for an evidentiary hearing on the minimization issue. Since they failed to allege sufficient specific facts that would substantiate their claim, the district court properly denied their request for an evidentiary hearing."); *United States v. Soto-Del Valle*, 102 F. Supp.2d 57, 62 (D.P.R. 2000), *aff'd*, 325 F.3d 1 (1st Cir. 2003) (denying defendants' motion for hearing on minimization issue when agent had outlined sufficient procedures to be followed in his affidavit in support of

wiretap application and defendants "failed to offer any proof of outrageous or systematically inappropriate or illegal behavior during the electronic surveillance at issue").

Confining my review to the parties' papers and the underlying wiretap-application documents, as I have determined is appropriate in this case, I recommend for the reasons that follow that the Weston, Moore, Jordan, Sanborn, Lara Sanborn, Towle, and Guarino motions to suppress be denied.

## I. Proposed Findings of Fact

### A. First Sanborn Application

On July 27, 2007, the government submitted an application to Chief Judge Singal for the interception, for up to 30 days, of wire communications pursuant to 18 U.S.C. § 2518(3) to and from cellular telephone number (207) 776-5194, subscribed to by Robert Sanborn ("Sanborn Telephone").  *See* Application for Interception of Wire Communications ("First Sanborn Application") (Docket No. 1), *In re Application of the United States of America for an Authorization To Intercept Wire Communications Occurring Over Cellular Telephone Number (207) 776-5194*, Misc. No. 07-96-P-S (D. Me.) ("*In re Sanborn Telephone*"), at 1-2, ¶ 3 & 6. The application was supported by a 40-page affidavit of United States Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") special agent Malcolm D. Van Alstyne, Jr.  *See* Affidavit in Support of Application for Authorization To Intercept Wire Communications ("July Van Alstyne Aff."), Exh. B to First Sanborn Application.

Van Alstyne explained that the government requested the wiretap as part of a joint investigation between the ATF and the United States Drug Enforcement Agency ("DEA") known as "Operation Trojan Horse," being conducted by the Portland, Maine, offices of the ATF and the DEA in conjunction with other local, state, and federal law enforcement officers.  *See id.*

at 7, ¶ 11.  The investigation targeted an organization believed to be responsible for distributing significant quantities of cocaine in Maine and elsewhere.  *See id.*  Investigators had learned that key participants in the organization were members of the Maine chapter of the Iron Horsemen Motorcycle Club ("IHMC"), including Szpyt, then the IHMC's president, and Weston, Sanborn, Balot, and Guarino, all five of whom were named as "target subjects" of the wiretap.  *See id.*; *see also* First Sanborn Application at 2, ¶ 4(a).  Investigators also had learned that the IHMC had a clubhouse located in Old Orchard Beach, Maine.  *See* July Van Alstyne Aff. at 7, ¶ 11.

## 1.  Showing of Necessity

Van Alstyne detailed investigative efforts to date, including:

1.      Extensive interviews of five confidential sources of information, all of whom had provided reliable information, implicating one or more of the target subjects in cocaine-trafficking activities.  *See id.* at 8-18, ¶¶ 13-22;

2.      Controlled purchases of cocaine from target subjects, a controlled payment of a debt for prior cocaine purchases, and controlled sales of contraband, using both confidential sources and undercover agents.  *See id.* at 18-22, ¶¶ 23-30;

3.      Analysis of call activity records for the Sanborn Telephone obtained from AT&T pursuant to a grand-jury subpoena, which revealed placement of 1,733 incoming calls to that number and 1,151 outgoing calls from that number for the period from May 1, 2007, to July 20, 2007, as well as the identities of the holders of phones from whom and to whom calls were made.  *See id.* at 23-24, ¶¶ 31-32; *see also id.* at 25, ¶ 35 (traditional investigative techniques used thus far included the use of pen registers and trap-and-trace devices on co-conspirators' telephones and obtaining records via grand-jury subpoena); and

4.      Physical surveillance of Sanborn and other suspected members of the

organization. *See id*. at 25, ¶ 35 & 29, ¶ 40.

Nonetheless, investigators to date had been unable to learn all of Sanborn's sources of supply, the identity of all persons distributing cocaine on his behalf, the timing of narcotics deliveries, methods of transportation, or the movement of Sanborn's drug proceeds. *See id*. at 33, ¶ 49. A significant goal of the investigation was to dismantle the entire network of individuals working with Sanborn. *See id*. at 33-34, ¶ 49. To accomplish that, agents still needed to learn and/or confirm the identities and roles of Sanborn and his associates in Maine and elsewhere and obtain admissible evidence against all participants in the conspiracy. *See id*. at 34, ¶ 49.

Van Alstyne stated that the requested wiretap was necessary because "normal investigative techniques have been used and have not succeeded in achieving the goals of the investigation, or have been tried and failed or had only limited success, or reasonably appear to be unlikely to succeed if tried, or they are too dangerous to employ[.]" *Id*. at 25, ¶ 33. He added that he believed that the wiretap was "the only available investigative technique which has a reasonable likelihood of revealing and of securing admissible evidence needed to establish the full scope and nature of the offenses being investigated, including determining the identity of all the members of the organization, their distribution methods and routes, locations used to conceal cocaine and other illegal drugs, and the assets purchased from the proceeds derived from the sale of narcotics." *Id*. at 25, ¶ 34.

Van Alstyne explained that while the investigation to date had unearthed information that had led to the identification of the target subjects and some of their associates, it had not yielded information revealing the identity of all co-conspirators involved in the network of distributors, the conspiratorial roles and activity of each known and unknown conspirator, or the content of

conspirators' communications via the Sanborn Telephone.  *See id.* at 26, ¶ 36.  Further, while the investigation had developed some information on one individual who might be a supplier of bulk cocaine to Szpyt, investigators had not developed sufficient evidence to identify or charge that individual.  *See id.*  For example, none of the confidential sources or undercover agents knew the identities and whereabouts of the target subjects' sources of supply or customers, the manner, extent, and organization of the drug distribution operations, the full extent of the target subjects' participation, or the nature, scope, places, or methods of operation of the narcotics trafficking and money laundering operations.  *See id.* at 26-27, ¶ 37.

While it was likely that additional controlled purchases of small quantities of cocaine could be made from some of the target subjects, it was unlikely that such purchases would result in the identification of other members of the conspiracy because, in controlled purchases to date, target subjects did not discuss other members of the conspiracy.  *See id.* at 27, ¶ 37.  As a result, consensual recordings made during controlled purchases had been of limited value.  *See id.*  One confidential source could likely order and obtain bulk cocaine directly from Szpyt; however, if the source were to do so, and the cocaine were subsequently seized, it would create a substantial risk of revelation of the source's identity and possible retaliation.  *See id.* at 27-28, ¶ 38.  In addition, while this source had been able to obtain some information relating to one of Szpyt's sources of supply, the source could not positively identify that individual and could not initiate dealings with that individual given the degree of danger such contact would pose to the source and the possible jeopardy to the investigation.  *See id.* at 28, ¶ 38.

For the same reasons that continued use of confidential sources was considered likely to be of limited utility, continued use of undercover officers and agents was considered insufficient to obtain admissible evidence to prosecute all members of the drug conspiracy.  *See id.* at 33,

¶ 47.   Undercover officers or agents would not be privy to the full scope of all co-conspirator conversations and activities.   *See id*.

Van Alstyne stated that agents had conducted, and would continue to conduct, physical surveillance, but that the technique had not been successful in identifying other members of the conspiracy or the criminal acts perpetrated by other conspirators.   *See id*. at 29, ¶ 40. Surveillance of Sanborn's residence in Old Orchard Beach was of limited utility given (i) its location in an area in which vehicles other than those expected there would appear out of place, and (ii) Sanborn's use of various locations to distribute controlled substances.   *See id*. at 29, ¶ 40. Agents expected to install a pole camera near Sanborn's residence soon, but that technique was expected to be of only limited assistance because the camera would not afford a view of the entirety of Sanborn's residence, identification of individuals in vehicles might be difficult, and the camera would not capture any activity or conversation occurring inside the residence or attached garage. *See id*.

Van Alstyne relayed that agents had found it extremely difficult and at times impossible to observe the IHMC clubhouse in Old Orchard Beach because they could not get close enough to observe people entering and leaving the clubhouse without calling attention to their presence. *See id*. at 30, ¶ 41.   A pole camera had been installed near the clubhouse; however, foliage surrounding the clubhouse obscured agents' view, and the camera was able to capture only activity near the end of the clubhouse driveway.   *See id*.   In addition, during the course of the investigation, agents had learned that the target subjects were cautious about surveillance, causing agents to use that technique sparingly.   *See id*. at 30, ¶ 42.  Further, the geographic scope of the conspiracy, encompassing Maine, Massachusetts, and possibly other locations, made continuous surveillance difficult to achieve.   *See id*.   Even when a meeting among co-

conspirators could be observed, that was of limited utility if the conversation could not be overheard. *See id*. Moreover, Van Alstyne explained, physical surveillance as a general matter would not accomplish the goals of the investigation, including the identification of co-conspirators and the true nature of the relationship between and among them. *See id*. at 31, ¶ 43.

Van Alstyne noted that agents had used pen registers and trap-and-trace devices in the course of the investigation, which provided evidence that telephones were used to make or receive calls but did not identify participants in the conversations or the content of those conversations. *See id*. at 31, ¶ 45. In Van Alstyne's view, only the interception of wire communications could do that. *See id*. He explained that trap-and-trace records usually are incomplete and identify only a small portion of the telephone numbers from which incoming calls are received and do not actually identify the individual making the call. *See id*.

Van Alstyne noted that investigators had considered, but had deemed not likely to succeed, the further use of the grand jury, interviews of subjects or associates, and the execution of search warrants. *See id*. at 25, ¶ 35. He had discussed the further use of the grand jury and of interviews of subjects or associates with Assistant United States Attorney Daniel J. Perry, and believed that use of those techniques would only alert the target subjects to the investigation, causing them to become more cautious, or to relocate to avoid further investigation or prosecution. *See id*. at 32, ¶ 46. If known associates of the target subjects were subpoenaed to testify before the grand jury, they likely would invoke their rights under the Fifth Amendment and refuse to testify. *See id*. Granting immunity at this time would foreclose future prosecution. *See id*. In addition, use of those techniques might result in the destruction or concealment of physical evidence, such as narcotics, records, and drug proceeds. *See id*. Finally, Van Alstyne and Perry believed that the threat of violence, both perceived and real, would deter potential

Grand Jury witnesses from either giving testimony at all or giving truthful testimony.  *See id*.

Information developed to date suggested that some of the target subjects had used violence in

conjunction with drug trafficking activity.  *See id*.

Finally, Van Alstyne noted, the execution of search warrants was considered premature.

*See id*. at 33, ¶ 48.  Their use would alert the target subjects to the existence of the investigation

and prevent the ATF and the DEA from identifying other co-conspirators or seizing contraband.

*See id*.  Moreover, investigators had not yet ascertained all locations where the target subjects

stored bulk cocaine.  *See id*.

### 2.  Minimization Procedures

In his affidavit in support of the First Sanborn Application, Van Alstyne represented that

"[t]he requirements regarding the minimization of interception will be strictly followed."  *Id*. at

35, ¶ 52.  He stated:

> Before interception begins, a memorandum regarding minimization and a copy of
> the Court's Order authorizing interception will be provided to all monitoring
> agents.  A copy of the Order and minimization memorandum will be posted at the
> listening site.  Before an agent begins to intercept communications, he or she will
> sign a form indicating that he or she has read the Affidavit, the Court's Order
> authorizing interceptions, and the minimization memorandum; is familiar with the
> contents of the Order; has attended a minimization meeting; and will intercept
> communications in compliance with the Court's Order.

*Id*.  Van Alstyne represented that monitoring agents would be instructed, *inter alia*, to (i) suspend

interception immediately when they determined that none of the named interceptees or their

confederates was participating in a conversation, unless the conversation was determined on

initial overhearing to be criminal in nature, (ii) suspend monitoring if the conversation was not

criminal in nature, even if it involved one or more of the named interceptees or their

confederates, (iii) use information from previous recordings of conversations intercepted from

the Sanborn Telephone to determine whether a particular call should be minimized as a non-

pertinent call, periodically monitoring lengthy conversations that appeared to be non-pertinent to determine whether they had become criminal in nature, (iv) recognize that husband-wife marital communications are privileged and that such conversations generally should be minimized, and (v) recognize that attorney-client communications are privileged and that monitoring of such conversations should be suspended so long as there is no reason to believe that the purpose of the conversation is to further crime or fraud.  *See id.* at 35-36, ¶ 52.  Van Alstyne also stated that all intercepted wire conversations would be recorded; all recordings would be securely preserved; logs would be prepared regarding the date and time of calls, the parties involved, the subject of the calls, and if and when minimization occurred; and reports detailing the course of the interception would be filed with the court on or about the 10th and 20th days following the commencement of any interception.  *See id.* at 36, ¶ 55.

### 3.  Court Order; Reports to Court

By order dated July 27, 2007, Chief Judge Singal authorized the requested wiretap of the Sanborn Telephone.  *See* Order Authorizing the Interception of Wire Communications ("First Sanborn Order") (Docket No. 2), *In re Sanborn Telephone*.  He found, *inter alia*, that "[t]he application and supporting affidavit have adequately demonstrated that normal investigative techniques have been tried and have failed or had limited success, and reasonably appear unlikely to further succeed if continued."  *Id.* at 2, ¶ 4.  With respect to minimization, he ordered, *inter alia*, that:

> monitoring of a conversation communication[] must immediately terminate when it is determined that the communication is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code, and that interception must be immediately suspended when it is determined through voice identification or otherwise that none of the target subjects or any of their confederates, when identified, are participants in the communication, unless it is determined during the portion of the communication already heard that the communication is criminal in nature.

12

*Id*. at 4-5.  He further ordered that "in the event intercepted communications are in a code or foreign language and an expert in that code or foreign language is not reasonably available at the time, minimization may be accomplished as soon as practicable after the communication is intercepted." *Id*. at 5.  He ordered that the government make reports to the court on or about the 10th, 20th, and 30th days following entry of the order, addressing progress made toward achievement of the wiretap's authorized objectives and the need for continued interception.  *See id*. at 6.

A first report was submitted to the court on August 6, 2007.  *See* First Report to the Court ("First Sanborn Report") (Docket No. 6), *In re Sanborn Telephone*.  On August 8, 2007, Chief Judge Singal reviewed it and approved continuation of the wiretap.  *See* Endorsement to *id*.  A second report was submitted to the court on August 15, 2007.  *See* Second Report to the Court ("Second Sanborn Report") (Docket No. 8), *In re Sanborn Telephone*.  On August 16, 2007, Chief Judge Singal reviewed it and approved continuation of the wiretap.  *See* Endorsement to *id*.

During the first reporting period, there were 404 completed calls, of which 109 appeared to be pertinent calls.  *See* First Sanborn Report at 2.  Fifteen calls were minimized, indicating that the conversation, while originally intercepted, was innocent in nature.  *See id*.  During the second reporting period, there were 370 completed calls, of which 140 appeared to be pertinent calls and 20 calls were minimized because, while originally intercepted, the conversation was actually innocent in nature.  *See* Second Sanborn Report at 2.

### B.  Second Sanborn Application

On August 24, 2007, the government filed an application to continue the Sanborn Telephone wiretap for up to an additional 30 days.  *See* Application for Continued Interception

of Wire Communications ("Second Sanborn Application") (Docket No. 10), *In re Sanborn Telephone*.  This application was accompanied by a new 38-page affidavit of Van Alstyne, to which Van Alstyne attached a copy of his prior affidavit in support of the First Sanborn Application.  *See* Affidavit in Support of Application for Authorization To Continue To Intercept Wire Communications ("August Van Alstyne Aff.") (Docket No. 11), *In re Sanborn Telephone*, & Exh. 1 thereto.   As a result of agents' continued investigatory efforts, including the fruits of the initial wiretap of the Sanborn Telephone, the list of named target subjects was expanded to 16, including the original five.  *See id*. at 2-3, ¶ 4; *see also* Second Sanborn Application at 2, ¶ 3.

### 1.  Showing of Necessity

In addition to recounting investigators' efforts prior to applying for a wiretap of the Sanborn Telephone and the limits and pitfalls of methods tried or considered but rejected, as set forth in his affidavit in support of the First Sanborn Application, *see* August Van Alstyne Aff. at 26, ¶ 19 & 27-36, ¶¶ 21-35, Van Alstyne reported that:

1.       Wiretap interception of the Sanborn Telephone during the initial authorization period had confirmed that Sanborn obtained cocaine from Szpyt and distributed it throughout the Old Orchard Beach area.  *See id*. at 26, ¶ 20.  The interceptions also had shown that, in addition to distributing cocaine, Sanborn was distributing marijuana that was believed to be supplied by Jordan.  *See id*.  However, an additional 30 days of interceptions was necessary to determine the identity of all of Sanborn's cocaine suppliers, to determine further the methods being used by Szpyt and possibly other persons who also supplied cocaine to Sanborn to deliver the cocaine into Maine, and to determine the methods being used by Sanborn and his co-conspirators to distribute the cocaine and marijuana within Maine.  *See id*.;

2.       Agents had developed one additional confidential source who possessed

information regarding distribution of cocaine in Haverhill, Massachusetts, but who had no knowledge of Sanborn or individuals conspiring with him in Maine to distribute cocaine and marijuana. *See id*. at 27, ¶ 21. It did not appear that the goals of the investigation could be reached by use of cooperating sources alone. *See id*. at 29, ¶ 23;

3.       Pole cameras now were being used to monitor the exterior of Szpyt's business in Haverhill, Massachusetts, and Sanborn's residence in Old Orchard Beach, Maine. *See id*. at 30, ¶ 24. Neither camera could capture activity occurring inside those locations or any audio activity. *See id*. Physical surveillance had been conducted relating to numerous calls intercepted during the original period of the wiretap. *See id*. For example, agents seized cocaine in one motor vehicle stop and marijuana in another motor vehicle stop made as a result of intercepted conversations. *See id*. However, such activity needed to be undertaken judiciously because it raised suspicion among the target subjects and co-conspirators. *See id*. Sanborn was aware that both individuals were apprehended soon after obtaining drugs from him. *See id*. While investigators had learned that Sanborn might have a "stash house" in Sanford, Maine, the house was located in a rural setting, rendering surveillance difficult. *See id*. at 30-31, ¶ 24. Further, while investigators had learned that Sanborn traveled to Oxford County, Maine, to deal with Jordan, the rural nature of that area made surveillance difficult. *See id*. at 31, ¶ 25. On one occasion, surveillance was attempted unsuccessfully when agents lost sight of Sanborn for fear that they would be detected if in too close a proximity. *See id*. Prolonged or regular surveillance of Sanborn's movements, or those of other target subjects, could create a risk that surveillance agents would be noticed, causing the targets to become more cautious in their illegal activities, to flee, or otherwise to compromise the investigation. *See id*. at 31, ¶ 27;

4.       While certain individuals had been arrested in connection with the investigation,

agents had conducted only brief interviews with them contemporaneously with their arrests and had not attempted to conduct further in-depth proffer sessions with them because Van Alstyne and other agents did not believe the interviews would accomplish the goals of the investigation, including the identification of co-conspirators. *See id*. at 34, ¶ 33. Such individuals would be likely to give false information or to advise the target subjects of the existence of the investigation. *See id*. at 34-35, ¶ 33. Both individuals arrested as a result of information learned from the initial wiretap had spoken to Sanborn about their arrests. *See id*. at 35, ¶ 33. Agents feared that, if they attempted in-depth interviews of these individuals, Sanborn likely would learn of the overall investigation. *See id*.; and

5.      The investigation still had not revealed all of Sanborn's sources of supply, all persons distributing cocaine on behalf of Sanborn, the timing of narcotics deliveries, or the methods of transportation. *See id*. at 35, ¶ 34.

### 2.  Minimization Procedures

Van Alstyne again represented that all interceptions would be minimized in accordance with chapter 119 of Title 18, United States Code. *See id*. at 36-37, ¶ 37.

### 3.  Court Order; Reports to Court

By order dated August 24, 2007, Senior Judge Gene Carter authorized the requested continuation of wiretap of the Sanborn Telephone. *See* Order Authorizing the Continued Interception of Wire Communications ("Second Sanborn Order") (Docket No. 12), *In re Sanborn Telephone*. He found, *inter alia*, that "[t]he application and supporting affidavit have adequately demonstrated that normal investigative techniques have been tried and have failed or had limited success, and reasonably appear unlikely to further succeed if continued." *Id*. at 3, ¶ 4. With respect to minimization, he ordered, *inter alia*, that:

monitoring of a conversation communication[] must immediately terminate when it is determined that the communication is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code, and that interception must be immediately suspended when it is determined through voice identification or otherwise that none of the target subjects or any of their confederates, when identified, are participants in the communication, unless it is determined during the portion of the communication already heard that the communication is criminal in nature.

*Id.* at 5.  He further ordered that "in the event intercepted communications are in a code or foreign language and an expert in that code or foreign language is not reasonably available at the time, minimization may be accomplished as soon as practicable after the communication is intercepted."  *Id.*  He ordered that reports be made to the court on or about the 10th, 20th, and 30th days following entry of the order addressing progress made toward achievement of the wiretap's authorized objectives and the need for continued interception.  *See id.* at 6.

A third report was submitted to the court on August 27, 2007.  *See* Third Report to the Court ("Third Sanborn Report") (Docket No. 14), *In re Sanborn Telephone*.  On August 29, 2007, Chief Judge Singal reviewed it and approved continuation of the wiretap.  *See* Endorsement to *id.*  During the third reporting period, there were 446 completed calls, of which 138 calls appeared to be pertinent calls, in that the conversation involved the alleged criminal offenses, and 10 calls were minimized, indicating that the conversation, while originally intercepted, was believed to be innocent in nature in whole or in part.  *See id.* at 2.

On September 5, 2007, September 17, 2007, and September 26, 2007, the government submitted additional reports to the court.  *See* Fourth Report to the Court ("Fourth Sanborn Report") (Docket No. 18), *In re Sanborn Telephone*; Fifth Report to the Court ("Fifth Sanborn Report") (Docket No. 20), *In re Sanborn Telephone*; Sixth Report to the Court ("Sixth Sanborn Report") (Docket No. 26), *In re Sanborn Telephone*.  Upon review of the Fourth and Fifth reports, Chief Judge Singal approved continuation of the wiretap.  *See* Endorsements to Fourth

Sanborn Report, Fifth Sanborn Report.  He reviewed the sixth and final report.  *See* Endorsement to Sixth Sanborn Report.  During the fourth reporting period, there were 510 completed calls, of which 118 appeared to be pertinent calls and 18 were minimized.  *See* Fourth Sanborn Report at 2.  During the fifth reporting period, there were 429 completed calls, of which 107 appeared to be pertinent and 11 were minimized.  *See* Fifth Sanborn Report at 2.  During the final reporting period, there were 752 completed calls, of which 67 appeared to be pertinent and four were minimized.  *See* Sixth Sanborn Report at 2.

### C.  Szpyt Application

On September 6, 2007, the government submitted an application to Chief Judge Singal for the interception for up to 30 days of wire communications pursuant to 18 U.S.C. § 2518(3) to and from a second cellular telephone number, (978) 360-0117, subscribed to by Debra Smith and believed to be used by Szpyt ("Szpyt Telephone").  *See* Application for Interception of Wire Communications ("Szpyt Application") (Docket No. 1), *In re Application of the United States of America for an Order Authorizing the Interception of Wire Communications Occurring Over Cellular Telephone Number (978) 360-0117 . . .*, Misc. No. 07-105-P-S (D. Me.) ("*In re Szpyt Telephone*"), at 2, ¶ 3 & 6.  The application was supported by a fresh 54-page affidavit of Van Alstyne to which he appended copies of his prior two affidavits submitted in support of the wiretap of the Sanborn Telephone.  *See* Affidavit in Support of Application for Authorization To Intercept Wire Communications ("September Van Alstyne Aff.") (Docket No. 2), *In re Szpyt Telephone*, & Exhs. A-B thereto.  Van Alstyne identified 17 target subjects, including the original five.  *See id.* at 7, ¶ 14; *see also* Szpyt Application at 2, ¶ 3.

### 1.  Showing of Necessity

Van Alstyne once again summarized the history of the Operation Trojan Horse

investigation, updated to include the fruits of the then-ongoing interception of the Sanborn Telephone.  *See* September Van Alstyne Aff. at 10-17, ¶¶ 16-17.  He supplied a number of excerpts of intercepted calls believed to be drug-related, including calls to and from the Sanborn Telephone to and from Szpyt using the Szpyt Telephone.  *See id*. at 12-17, ¶ 17 & n.3.  He also analyzed results of pen registers and trap-and-trace devices used to monitor the Szpyt Telephone for the period from April 14 through August 21, 2007.  *See id*. at 33-38, ¶¶ 36-41.

Van Alstyne stated that he believed that the interception of wire communications of the target subjects and others as yet unknown on both the Sanborn and Szpyt telephones was the only available investigative technique with a reasonable likelihood of revealing and securing admissible evidence needed to establish the full scope and nature of the offenses being investigated, including determining the identity of all members of the organization, their distribution methods and routes, locations used to conceal cocaine and other illegal drugs, and the assets purchased from the proceeds derived from the sale of narcotics.  *See id*. at 37, ¶ 40.  He averred that all traditional avenues of investigation had been carefully evaluated for use or had been attempted with limited results, including the use of cooperating confidential sources and undercover agents, the use of pen registers and trap-and-trace devices on co-conspirator telephones, the controlled purchases of narcotics, the controlled payments for past drug debts, a controlled purchase of a firearm from a co-conspirator, obtaining records via grand-jury subpoena, and physical surveillance of Szpyt, Sanborn, and other suspected members of the organization.  *See id*. at 37-38, ¶ 41.  He detailed the limitations of each of these methods, along the lines set forth in his prior two affidavits.  *See id*. at 38-46, ¶¶ 42-54.  He noted that the further use of the grand jury, interviews of subjects or associates, and the execution of search warrants were not considered viable options at that time for essentially the same reasons outlined in his

prior affidavits.  *See id*. at 38, ¶ 41 & 45-49, ¶¶ 53-57.

In recounting efforts undertaken to date, Van Alstyne stated that the investigation had developed some information that two individuals might be supplying bulk cocaine to Szpyt, but had not been able to develop sufficient evidence to determine whether both were involved, the nature and extent of any involvement, and whether they were acting in concert with each other. *See id*. at 38, ¶ 42.  Nor had investigators developed sufficient information to charge either individual or to identify the timing, method of delivery, or storage locations used by any of Szpyt's suppliers.  *See id*. at 38-39, ¶ 42.  While investigators had found a seventh cooperating source who was familiar with Szpyt's suspected suppliers and was aware of their reputations as cocaine and pharmaceuticals traffickers, that source had never had any dealings with them and had no information regarding Szpyt.  *See id*. at 41, ¶ 45.  Therefore, even if that source could successfully develop a relationship with either or both of those individuals, a process that could take some time because of the need to first establish trust before obtaining cocaine from them, the source would not be able to achieve the goals of the investigation, including obtaining the identities and whereabouts of Szpyt's customers, and the manner, extent, and organization of his drug distribution operations.  *See id*.

## 2.  Minimization Procedures

As he had in the context of the initial application for wiretap of the Sanborn Telephone, Van Alstyne represented that minimization requirements would be strictly followed if the application for the Szpyt Telephone wiretap were approved.  *See id*. at 49, ¶ 60.  He indicated that the government would take the same precautions with monitoring agents and provide the same instructions as in the case of the wiretap of the Sanborn Telephone.  *Compare id*. at 49-53, ¶¶ 60-65 *with* July Van Alstyne Aff. at 35-39, ¶¶ 52-57.

### 3.  Court Order; Reports to Court

By order dated September 6, 2007, Chief Judge Singal authorized the requested wiretap of the Szpyt Telephone.  *See* Order Authorizing the Interception of Wire Communications ("Szpyt Order") (Docket No. 3), *In re Szpyt Telephone*.  He found, *inter alia*, that "[t]he application and supporting affidavit have adequately demonstrated that normal investigative techniques have been tried and have failed or had limited success, and reasonably appear unlikely to further succeed if continued." *Id.* at 3, ¶ 4.  With respect to minimization, he ordered, *inter alia*, that:

> monitoring of a conversation communication[] must immediately terminate when it is determined that the communication is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code, and that interception must be immediately suspended when it is determined through voice identification or otherwise that none of the target subjects or any of their confederates, when identified, are participants in the communication, unless it is determined during the portion of the communication already heard that the communication is criminal in nature.

*Id.* at 6.  He further ordered that "in the event intercepted communications are in a code or foreign language and an expert in that code or foreign language is not reasonably available at the time, minimization may be accomplished as soon as practicable after the communication is intercepted." *Id.*  He ordered that reports be made to the court on or about the 15th and 30th days following entry of the order addressing progress made toward achievement of the wiretap's authorized objectives and the need for continued interception.  *See id.* at 7.

A first report was submitted to the court on September 24, 2007.  *See* First Report to the Court ("First Szpyt Report") (Docket No. 7), *In re Szpyt Telephone*.  On September 25, 2007, Chief Judge Singal reviewed it and approved continuation of the wiretap.  *See* Endorsement to *id*.  A second report was submitted to the court on October 9, 2007.  *See* Second Report to the Court ("Second Szpyt Report") (Docket No. 11), *In re Szpyt Telephone*.  On October 15, 2007,

Chief Judge Singal reviewed it.  *See* Endorsement to *id*.

During the first reporting period, there were 1,861 completed calls, of which 122 appeared to be pertinent and 79 were minimized.  *See* First Szpyt Report at 2.  During the second reporting period, which continued until October 4, 2007, when interception was terminated, there were 706 completed calls, of which 87 appeared to be pertinent and 62 were minimized.  *See* Second Szpyt Report at 1-2.

## II. Discussion

The interception of electronic communications as an investigative technique is governed by Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510-22 ("Title III").  *See United States v. David*, 940 F.2d 722, 727 (1st Cir. 1991).  Title III confers standing on any "aggrieved person" to move to suppress evidence derived from electronic surveillance.  *See* 18 U.S.C. § 2518(10)(a).  An "aggrieved person" is defined as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed[.]"  *Id*. § 2510(11).  The government does not contest that the defendants who have moved to suppress intercepted communications, or joined in motions to do so, have standing to seek suppression of those communications.  *See generally* Opposition.

### A.  Necessity

The defendants' motions implicate the so-called "necessity" requirement, "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."  *Rivera-Rosario*, 300 F.3d at 18 (citation and internal quotation marks omitted).  An application for an order authorizing the interception of a wire, oral, or electronic communication must include, *inter alia*:

**(c)** a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

***

 **(f)** where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results.

18 U.S.C. § 2518(1).

In issuing an order authorizing wiretapping, an issuing judge must, *inter alia*, determine on the basis of the facts submitted by the applicant that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" *Id*. § 2518(3)(c).

To demonstrate necessity, "the government is not required to show that other investigatory methods have been completely unsuccessful, nor is the government forced to run outlandish risks or to exhaust every conceivable alternative before resorting to electronic surveillance." *Rivera-Rosario*, 300 F.3d at 19 (citations omitted). Instead, "the government must demonstrate that it has made a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." *United States v. López*, 300 F.3d 46, 52 (1st Cir. 2002) (citation and internal quotation marks omitted). Its affidavit in support of a wiretap application "must show with specificity why ordinary means of investigation will fail; conclusory statements without factual support are not sufficient." *Id*. at 53; *see also, e.g., United States v. Ashley*, 876 F.2d 1069, 1072 (1st Cir. 1989) "([B]are conclusory statements that normal techniques would be unproductive, based solely on an affiant's prior experience, do not comply with the requirements of section 2518(1)(c).").  Nevertheless, "the issuing court may properly take into account affirmations which are founded in part upon the experience of specially trained agents." *Id*.

In assaying the necessity for a wiretap, the court should consider the nature of the alleged crimes and may give weight to the opinion of investigating agents that, in the circumstances described, other means of investigation were too dangerous and might be counterproductive. *See, e.g., In re Dunn*, 507 F.2d 195, 197 (1st Cir. 1974). "[T]he mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap." *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000).

"A wiretap authorization order is presumed proper, and the Defendants carry the burden of overcoming this presumption." *United States v. Mondragon*, 52 F.3d 291, 292 (10th Cir. 1995) (citation and internal quotation marks omitted). The task of a reviewing court examining an issuing judge's wiretap order in the context of a motion to suppress is to "examine[] the face of the affidavit and decide[] if the facts set forth in the application were minimally adequate to support the determination that was made[.]" *Villarman-Oviedo*, 325 F.3d at 9 (citation and internal quotation marks omitted). "That is, the sufficiency of the affidavit is to be upheld where the [reviewing] court determines that the issuing court could have reasonably concluded that normal investigatory procedures reasonably appeared to be unlikely to succeed." *López*, 300 F.3d at 53 (citation and internal punctuation omitted); *see also, e.g., Rivera-Rosario*, 300 F.3d at 19 n.23 ("When reviewing a wiretap application, it is not our province to engage in *de novo* review of an application; instead, we test it in a practical and commonsense manner to determine whether the facts which it sets forth are minimally adequate to support the findings made by the issuing judge.") (citations and internal punctuation omitted).

The same standard pertains when the district court "is 'reviewing' the prior district court authorization of a wiretap application in the course of a suppression motion challenging the

facial sufficiency of the affidavit." *Ashley*, 876 F.2d at 1074. "This inquiry is not rigid or rule-oriented; to the precise contrary, Title III demands a practical, commonsense approach to exploration of investigatory avenues and relative intrusiveness." *David*, 940 F.2d at 728 (citation and internal quotation marks omitted).

Weston contends that that the July Van Alstyne Affidavit failed to demonstrate necessity for the initial Sanborn Telephone wiretap because:

1.     Before obtaining the intercept order, the government already had made great progress using tools short of wire intercepts and was in a position to indict every one of the investigation targets without them. *See* Weston Motion at 8;

2.     The government did not use pole cameras to monitor the IHMC clubhouse in Old Orchard Beach until the wiretap was in place. *See id.*;

3.     No mention was made of any attempt to employ searches of trash or to infiltrate the IHMC using an undercover officer. *See id.*;

4.     The government failed to seek warrants to search the Sanborn and IHMC properties until after the wiretaps were in place, even though the information contained in the intercept application could have supported applications for warrants to search both. *See id.* at 8-9;

5.     The government ignored the traditional and often fruitful path of monitoring suspects' finances. *See id.* at 9. There is no information about bank records, employment records, or asset checks. *See id.*;

6.     While the affidavit outlined numerous controlled buys, more were feasible. *See id.*;

7.      Phone calls could have been recorded with one party's consent, a procedure that is legal in Maine.  *See id*.;

8.      Cooperating sources and undercover officers participating in controlled buys could have used recording or broadcasting devices.  *See id*.; and

9.      Tracking devices could have been used to monitor the travel of suspect motor vehicles and to maintain surveillance.  *See id*. at 10.

Weston posits that the government perpetuated this initial error by (i) seeking an order for continuation of the wiretap on the Sanborn Telephone when, after the first 30 days of that wiretap, agents could have used traditional methods to follow up on the information gained, and (ii) seeking to wiretap the Szpyt Telephone as against the same targets during the pendency of the continued Sanborn Telephone wiretap.  *See id*.  He argues that (i) the August Van Alstyne Affidavit simply asserted that an additional 30 days was necessary to achieve the investigation's goals without first attempting other investigative approaches or explaining why all goals were not met during the initial surveillance period, and (ii) the Szpyt Application simply repackaged the August Van Alstyne Affidavit, without using information gathered from the Sanborn Telephone intercept or attempting alternative methods of investigation.  *See id*. at 10-11.  He concludes that even if the court should find a basis for the first Sanborn Telephone interception, there was no necessity for its continued interception or interception of the Szpyt Telephone.  *See id*. at 11.

Beyond this, Jordan argues that while the July Van Alstyne Affidavit adequately addressed agents' use of confidential informants and undercover agents, the affidavit failed to show, with the requisite specificity, why other investigative techniques would fail.  *See* Jordan Motion at 4.  He asserts that, although the investigation had gone on for more than three years,

the only techniques fully employed and exhausted were controlled buys and the use of confidential informants.  *See id.*  He reasons that because other investigative techniques such as grand-jury subpoenas and pole cameras were not used until 2007, and then were used only minimally and for a limited period of time, there was no good-faith effort to run the gamut of investigative techniques.  *See id.* at 4-5.  Szpyt adds that the government not only had additional investigative tools short of wire intercepts as described in the Weston Motion but also allegedly had six confidential informants who could easily have been used to infiltrate the alleged conspiracy.  *See* Szpyt Joinder Motion.

After careful review of the supporting affidavits submitted in support of the First Sanborn Application, the Second Sanborn Application, and the Szpyt Application, I have no difficulty concluding that the government's applications, supported by the Van Alstyne affidavits, were more than minimally adequate to persuade Judges Singal and Carter that the wiretaps were reasonably necessary.

Review of the July Van Alstyne Affidavit makes clear that agents participating in Operation Trojan Horse had made extensive use of confidential sources and undercover agents and had tried a number of other traditional investigative techniques, including the use and analysis of pen registers, telephone records, physical surveillance, and consensually monitored calls.  Van Alstyne provided detailed and plausible descriptions of the limitations of each of those methods in achieving the overall goal of dismantling the entire drug-trafficking network in which IHMC members were alleged participants, to wit:

1.      No confidential source was able to purchase a large quantity of controlled substances, none knew the full scope of the conspiracy, and the conspirators did not discuss other members or details of the conspiracy in the sources' presence.  *See* July Van Alstyne Aff. at 26-

28, ¶¶ 37-38.  The same was true of undercover agents.  *See id.* at 33, ¶ 47.  Moreover, Chief Judge Singal reasonably could have concluded, given the detailed criminal histories of the confidential sources, some of whom were paid for their assistance, *see id.* at 8-11, ¶¶ 13-17, that their testimony would be subject to impeachment and hence would require corroboration.  Such limitations and considerations tend to bolster a finding of necessity.  *See, e.g., Bennett*, 219 F.3d at 1122-23 (informant's successful undercover purchase of narcotics did not defeat necessity showing, where informant remained unable to penetrate the organization and was subject to impeachment as an informant); *United States v. Guerra-Marez*, 928 F.2d 665, 671 (5th Cir. 1991) (gaps in investigation and need to corroborate confidential source are appropriate factors to consider in determining necessity);

2.     Physical surveillance of Sanborn's residence was rendered difficult by its location in an area in which vehicles other than those expected to be there would appear out of place, and agents had found it difficult and at times impossible to get close enough to observe the IHMC clubhouse without calling attention to themselves.  *See* July Van Alstyne Aff. at 29-30, ¶¶ 40-41.  A pole camera had been installed near the clubhouse but was of limited value given surrounding foliage.  *See id.* at 30, ¶ 41.  Agents expected shortly to install a pole camera near Sanborn's residence but believed that it, too, would be of limited utility given its location.  *See id.* at 29, ¶ 40.  In any event, physical surveillance inherently could not accomplish the goals of the investigation, including the identification of co-conspirators and the true nature of the relationship between and among them.  *See id.* at 31, ¶ 43; and

3.      The use of pen registers and trap-and-trace devices had provided evidence that telephones were used to make or receive calls, but such techniques inherently do not identify participants in the conversations or divulge the contents of calls.  *See id.* at 31, ¶ 45.

Van Alstyne also provided detailed and plausible explanations as to why methods such as the further use of the grand jury, interviews of target subjects or their associates, and the use of search warrants had been considered but rejected at that time. *See id.* at 32-33, ¶¶ 46-48. He and Perry feared that further use of the grand jury or interviews of subjects or associates likely would alert the target subjects to the investigation, causing them to become more cautious or to relocate. *See id.* at 32, ¶ 46. In addition, he and Perry anticipated that known associates of the target subjects might invoke their Fifth Amendment right not to testify if subpoenaed to appear before the grand jury. *See id.* Further, he and Perry believed that the threat of violence would deter potential grand-jury witnesses from testifying at all or from giving truthful testimony. *See id.* This was not groundless speculation: agents had received information that some of the target subjects had resorted to violence incident to their drug-trafficking activity. *See id.* The execution of search warrants was considered premature because their use would alert the target subjects to the existence of the investigation and prevent the ATF and the DEA from identifying other co-conspirators and seizing additional contraband. *See id.* at 33, ¶ 48. Moreover, investigators had not yet detected all locations in which cocaine was stored. *See id.*

These detailed, plausible explanations sufficed to establish necessity for the initial Sanborn Telephone wiretap. *See López*, 300 F.3d at 53 (DEA agent's affidavit was more than minimally adequate to show necessity for wiretap when he (i) described several alternative investigative techniques that had been tried and failed, appeared unlikely to succeed, might alert the conspirators, or were too dangerous to pursue, (ii) explained that the utility of certain techniques, such as physical surveillance, interrogation of informants, pen-register analysis, and controlled buys, had been exhausted or greatly diminished, and (iii) demonstrated that the traditional techniques employed over the course of several months had failed to establish the

identity of some of the conspirators, particularly those at the top of the distribution chain); *Rivera-Rosario*, 300 F.3d at 19 (government made adequate showing of necessity for wiretap when it "describe[d] in detail the surveillance techniques which had been tried, such as physical surveillance, pen registers, closed-circuit television cameras, records checks, and debriefings[,]" "described all the reasons why these tactics had been ineffective or limited in use[,]" and "list[ed] other available methods which were not viable options, including the use of grand jury subpoenas and search warrants, which would have alerted conspirators to the ongoing investigation").

Even assuming *arguendo*, as Weston suggests, that agents already had obtained sufficient admissible evidence through an array of traditional techniques to charge the initial targets as of the time of filing of the First Sanborn Application, that is not dispositive of the necessity issue. As Van Alstyne made clear, agents suspected that the drug-trafficking ring encompassed other individuals besides the initial targets.  Agents had been unsuccessful in identifying all of Sanborn's sources of supply, the identity of all individuals distributing cocaine on his behalf, the timing of narcotics deliveries, transportation methods, and the movement of Sanborn's drug proceeds.  *See* July Van Alstyne Aff. at 33, ¶ 49.  Further, while agents had developed some information on an individual who might be a bulk supplier of cocaine to Szpyt, they did not have sufficient evidence to identify or charge that person.  *See id*. at 26, ¶ 36.  Necessity for the wiretap thus was not undercut by the investigation's initial successes.  *See, e.g., United States v. Rivera*, 527 F.3d 891, 902 (9th Cir. 2008) ("The necessity for the wiretap is evaluated in light of the government's need not merely to collect some evidence, but to develop an effective case against those involved in the conspiracy.  Thus, we have consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of

the main conspirators, but not to apprehension and prosecution of other satellite conspirators.")
(citations and internal punctuation omitted); *Rivera-Rosario*, 300 F.3d at 19 (rejecting argument
that traditional investigative methods sufficed when, although "the government's less intrusive
methods had provided some valuable assistance in the investigation, much of the conspiracy's
scope and dealings were still undisclosed"); *David*, 940 F.2d at 728-29 (rejecting defendant's
necessity challenge where affiant indicated that use of traditional methods, including questioning
of three informants and study of public documents and telephone toll records, had not disclosed
identities of all of suspect's current drug customers or suppliers).

To the extent that Weston, Jordan, and Szpyt argue that agents could and should have
employed a number of additional traditional methods before resorting to the wiretap application,
or tried them sooner, their point is not well-taken.  Agents had in fact tried certain of Weston's
suggested methods prior to the filing of the First Sanborn Application, including the use of pole
cameras, controlled buys, and consensual recordings, but had not achieved the goal of
dismantling the entire alleged drug-trafficking organization via these methods and, as a result of
the techniques' inherent limitations or limitations in the circumstances, could not do so.  The use
of search warrants was considered but reasonably rejected as premature.  Finally, while there is
no indication that agents considered certain other methods, such as trash searches or monitoring
of the suspects' financial records, that is not fatal to a finding of necessity.  *See, e.g., Rivera*, 527
F.3d at 903 (while defendants might be correct that the DEA could have conducted physical
surveillance of target's family, could have used a confidential source for a longer period of time
in the hope that he/she would penetrate the drug-trafficking organization, and could have
performed trash runs at other suspects' residences, "law enforcement officials need not exhaust
every conceivable alternative before obtaining a wiretap") (citations and internal quotation marks

omitted); *López*, 300 F.3d at 52 ("[T]he necessity requirement is not tantamount to an exhaustion requirement."); *David*, 940 F.2d at 728-29 ("Because drug trafficking is inherently difficult to detect and presents formidable problems in pinning down the participants and defining their roles, investigative personnel must be accorded some latitude in choosing their approaches. . . . An application for electronic surveillance need not be based on proof positive that, without electronic assistance, a promising investigation is up a blind alley.  It is enough that reasonable efforts to succeed without such assistance have been tried and failed, and that electronic surveillance seems a suitable next step in a plausible progression.").

In his affidavits in support of continuation of the Sanborn Telephone wiretap and establishment of the Szpyt Telephone wiretap, Van Alstyne again provided plausible, detailed descriptions why, despite obtaining information from the initial wiretaps and employing additional traditional methods to follow up on that information (including development of two more confidential sources, the use of pole cameras to monitor the outside of Sanborn's residence and Szpyt's place of business, and traffic stops, arrests, and limited interviews of suspected co-conspirators) continuation of the Sanborn Telephone wiretap and, later, establishment of the Szpyt Telephone wiretap were necessary.  In support of the Second Sanborn Application, Van Alstyne noted that the original interceptions had confirmed that Szpyt was supplying cocaine to Sanborn but that an additional period of interception was necessary to uncover other aspects of the drug-trafficking conspiracy, including the identity of all of Sanborn's suppliers, the methods being used to deliver cocaine into Maine, and the methods of distribution in Maine.  *See* August Van Alstyne Aff. at 26, ¶ 20 & 35, ¶ 34.  Van Alstyne also explained why other traditional investigative techniques continued to be insufficient to meet the goals of the investigation.  For example, while the initial wiretap was successful in identifying another conspirator (Jordan) and

a possible stash house, surveillance of that individual and location were difficult. *See id*. at 26, ¶ 20 & 30-31, ¶¶ 24-26. Further, while traffic stops had been made of two suspects, agents deliberately eschewed detailed interviews of the conspirators for fear that they would provide untruthful information and/or tip off co-conspirators to the ongoing investigation. *See id*. at 34-35, ¶ 33. Indeed, these two suspects had promptly informed Sanborn of the stops. *See id*. at 35, ¶ 33.

In support of the Szpyt Application, Van Alstyne explained that the investigation to that point had developed information that two individuals might be supplying bulk cocaine to Szpyt, but that agents had insufficient evidence to determine whether both individuals were involved and the nature and extent of their involvement. *See* September Van Alstyne Aff. at 38, ¶ 42. Nor had investigators developed sufficient information to charge either individual or to identify the timing, method of delivery, or storage locations used by any of Szpyt's suppliers. *See id*. at 38-39, ¶ 42.

The necessity for continuation of the Sanborn Telephone wiretap and for initiation of the Szpyt Telephone wiretap accordingly was adequately shown. *See, e.g., United States v. Garcia*, 232 F.3d 1309, 1315-16 (10th Cir. 2000) (earlier wiretap of suspect's phone did not obviate the need for wiretap of phone of suspected leader of drug conspiracy when the extent of suspected leader's dealings and the source from which he obtained drugs remained unknown, and the fact that he was the highest known participant in the conspiracy made it difficult to collect information on him and his suppliers from lower-level members).

In short, it is clear in this case, as the United States Court of Appeals for the Ninth Circuit found in *Rivera*, that agents "did not seek to use the wiretap as the initial step in the . . . investigation but instead used numerous investigative techniques, and considered using several

others, over the course of [the] . . . investigation before applying for the wiretap." *Rivera*, 527 F.3d at 902.  Here, as in *Rivera*, "[w]hile the government could probably have relied on these techniques alone to successfully prosecute a few individuals . . . for drug crimes, the issuing court did not abuse its discretion in concluding that the wiretap was necessary to identify the full scope of the [drug-trafficking] organization and develop an effective case against its members." *Id*. (citation and internal quotation marks omitted).

### B.  Minimization

Moore and Guarino finally also argue that the government failed to adopt reasonable measures to minimize the interception of conversations unrelated to criminal activity.  *See* Moore Motion at 1-2; Guarino Motion at 1-2.  Pursuant to 18 U.S.C. § 2518(5), "[e]very order and extension thereof shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter[.]"  18 U.S.C. § 2518(5).  As Moore and Guarino observe, *see* Moore Motion; Guarino Motion, the minimization requirement "spotlights the interest in confining intrusions as narrowly as possible so as not to trench impermissibly upon the personal lives and privacy of wiretap targets and those who, often innocently, come into contact with such suspects[,]" *United States v. Hoffman*, 832 F.2d 1299, 1307 (1st Cir. 1987).

The standard for judging minimization efforts is one of "objective reasonableness." *United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000) (citations and internal quotation marks omitted).  "The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott v. United States*, 436 U.S. 128, 140 (1978); *see also, e.g., López*, 300 F.3d at 57 (the standard is one "of honest effort; perfection is usually not

attainable, and is certainly not legally required") (citations and internal quotation marks omitted); *Charles*, 213 F.3d at 22 ("[T]he critical inquiry is whether the minimization effort was managed reasonably in light of the totality of the circumstances.").

Factors relevant to the reasonableness of the government's minimization efforts include "1) the nature and complexity of the suspected crimes; 2) the thoroughness of the government's precautions to bring about minimization; and 3) the degree of judicial supervision over the surveillance process." *López*, 300 F.3d at 57.  In cases in which "an investigation involves a drug ring of unknown proportion, . . . the need to allow latitude to eavesdroppers is close to its zenith." *Charles*, 213 F.3d at 22 (citation and internal quotation marks omitted); *see also, e.g., Bennett*, 219 F.3d at 1124 ("Where, as here, the wire intercept concerns a drug ring, the need to allow latitude to monitoring agents is paramount.  The fact that the FBI overheard a few innocent conversations does not render its minimization efforts unreasonable. . . .  Moreover, if phone conversations include guarded or coded language as in this case, a higher rate of nonrelevant intercepted calls should be expected because it takes longer to figure out the meaning of a particular call.") (citations and internal punctuation omitted); *United States v. Wilson*, 835 F.2d 1440, 1445-46 (D.C. Cir. 1987) (rejecting defendant's minimization argument in case in which monitored conversations often started with discussion of non-criminal matters, as a result of which agents reasonably could have believed conversation might turn at any moment to criminal activities); *United States v. Cleveland*, 964 F. Supp. 1073, 1093 (E.D. La. 1997) ("When the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise.  This is especially true when the judicially approved wiretap is designed to identify unknown coconspirators.") (citations and internal quotation marks omitted).

"[O]nce the issue of minimization has been raised, the Government must then make a *prima facie* showing that its minimization efforts were reasonable." *United States v. Lopez*, No. CRIM. 99-79-P-C, 2000 WL 761977, at *6 (D. Me. Apr. 28, 2000), *aff'd*, 300 F.3d 46 (1st Cir. 2002). "Once such a showing has been made, the burden shifts to the defendant to demonstrate that more effective minimization could have taken place." *Id.*

The government meets its *prima facie* burden of showing that its minimization efforts were reasonable. In his affidavits supporting all three wiretap applications at issue, Van Alstyne averred that minimization standards would be strictly followed, that monitoring agents would be trained to implement such standards, including respect for the privacy of innocent and privileged phone calls, and that the government would supply periodic reports to the court touching, *inter alia*, on its minimization efforts. Similar procedures and training have been deemed adequate in other cases. *See, e.g., Rivera*, 527 F.3d at 904-05 (monitoring procedures and training were adequate, for minimization purposes, when, *inter alia*, agents and monitors were required to read affidavit submitted in support of wiretap, court order authorizing wiretap, and minimization memorandum written by Assistant United States Attorney, who personally instructed all agents and monitors present on the first day of the wiretap, and minimization memorandum instructed monitors to immediately terminate interception of a call if no target subject or criminal associate was participating, to intercept calls for a reasonable time, usually not more than two minutes, to determine whether the conversation concerned criminal activities, and monitors could ask on-site agent or contact other listed persons if they had questions). As was appropriate in the circumstances, involving investigation into a drug ring of unknown proportion, with as-yet-unidentified co-conspirators and use of code language, monitoring agents were authorized to listen to a sufficient number and length of calls to determine whether code language was being

used to transact drug business and to keep track of that code language once understood. *See Cleveland*, 964 F. Supp. at 1093 ("When nonpertinent calls are short, ambiguous in nature, and/or involve guarded or coded language, agents can hardly be expected to know that the calls are pertinent prior to their termination and hence their interception is entirely reasonable.") (citation and internal quotation marks omitted). Periodic reports were in fact submitted to the court showing minimization of certain non-pertinent calls, a further factor counseling in favor of a finding of reasonableness. *See id*. at 1095 ("[The government regularly reported the results of its interceptions in written 10 day reports and in oral reports to Judge Polozola. This further supports the general conclusion that [its] minimization efforts were reasonable.").

Moore and Guarino chose not to respond to the government's showing with a reply brief and proffer of evidence of particular examples or patterns of insufficient minimization. Based on the foregoing, their motions to suppress wiretap interceptions on minimization grounds fail.

### III. Conclusion

For the foregoing reasons, I **GRANT** the motions to join in the Weston Motion filed by Monahan, Martin, Charron, Sanborn, Lara Sanborn, and Towle, recommend that the Green and Balot motions to suppress be **DISMISSED AS MOOT**, and recommend that the proposed findings of fact herein be adopted and that the Weston, Moore, Jordan, Sanborn, Lara Sanborn, Towle, and Guarino motions to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 9th day of November, 2008.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge